IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

Plaintiff,

v Case No: 1:23-cr-112

JORGE LUIS MEDRANO,

Defendant.
______________________________/

FINAL PRETRIAL CONFERENCE

BEFORE THE HONORABLE PAUL L. MALONEY
United States District Judge

Kalamazoo, Michigan
Monday, August 19, 2024

APPEARANCES:

For the Plaintiff: MR. AUSTIN J. HAKES
MR. DANIEL Y. MEKARU
330 Ionia Avenue, N.W., Suite 501
Grand Rapids, Michigan 49503-2580
(616) 307-9361

For the Defendant: MR. JOSHUA A. BLANCHARD
Blanchard Law
309 South Lafayette Street, Suite 208
Greenville, Michigan 48838
(616) 773-2945

MS. SUNDUS K. JABER
The Law Offices of Sundus K. Jaber, PLLC
39111 Six Mile Road
Livonia, Michigan 48152
(734) 419-1174

REPORTED BY: Lauret J. Henry, CSR-6469, RPR
Federal Official Court Reporter
410 West Michigan, Suite 137
Kalamazoo, MI 49007
(269) 720-9529

Kalamazoo, MI
August 19, 2024
2:34 p.m.

RECORD

THE COURT: This is File Number 23-112, the United States of America versus Jorge Medrano. This matter is before the Court for a final pretrial conference. This case is set for trial next week. The Court advises counsel this is Number 1 on the Court's trial calendar for that period of time.

The record should reflect that Assistant United States Attorneys Hakes and Mekaru represent the government. Attorneys Blanchard and Jaber represent the defendant. The defendant is present in person. The defendant is in need of the assistance of an interpreter to translate Spanish into English and English into Spanish. Ms. Ellen Donohue is here for that purpose. Ms. Donohue has an oath on file, so it's not necessary to swear her individually for these proceedings.

First, as far as jury selection is concerned, the Court will seat 14 jurors. I'll grant each side one additional peremptory. The alternates for the jury panel will be the two individuals seated in the first and second row to the extreme right of the jury box. They will not know that they are alternates, but on blind draw at the conclusion of the case those two jurors will be excused absent some intervening circumstance in the -- during the trial.

The Court has had the benefit of the trial briefs filed by the government and the defendant. I also have proposed voir dire from both parties and a joint statement filed by the government only. Proposed jury instructions were filed on August 16, which is ECF 57.

The Court has multiple motions pending at this particular point in time, and unless either party wants some other subject addressed, why don't we move towards resolution of the -- some of the motions if we can.

First is the defendant's motion in limine to exclude dual fact and expert testimony, which is ECF 46. The government filed a response, which is ECF 51. So with that introduction, Mr. Blanchard, go ahead, sir.

MR. BLANCHARD: Thank you, Your Honor. So, you know, I don't have a lot to add beyond my brief. I think the concern here, like with Gancer, and Detective Gancer in particular, he's heavily involved in the investigation, and to have him say, "I heard things, I saw things, and in my training and experience, you know, sort of trust me, I'm an expert, I know these things are indicative of drug trafficking, I know that this word means this thing," I think that's problematic. I think the Sixth Circuit has said that's, you know, at least problematic. There's clearly not a per se bar on that. I think the better approach here is to not permit it. And they've got another expert noticed for the

exact same thing who -- he did have, apparently, some role in the investigation. I have seen very little of that. And so it might be safer to have that testimony come in from someone like Agent Pond rather than Detective Gancer.

To the extent that the Court is inclined to permit it, I think we need to take great care to make sure that it's done in a way that the jury doesn't think the witness has some special knowledge or extra knowledge that they don't know and that they're vouching as an expert. I think the cases where it, you know, has sort of been blessed, they break up the testimony into different days, provide an instruction, you know, with -- when the expert testimony comes, but I'm not sure it's necessary here, and I think it risks prejudice that isn't warranted. So, you know, I think the best approach would be to say, you got to pick, he's either testifying as a fact or an expert witness, and I think they can cover all their facts without having either of the witnesses do both.

THE COURT: The remedial aspects of the government's submission and response to your motion do call to call the witness, Officer Gancer, twice, with apparently at the appropriate time an instruction, which has passed muster with the circuit. Why isn't that sufficient?

MR. BLANCHARD: I'm afraid the Sixth Circuit might say it's sufficient. I just don't know that it's necessary here. I think we have -- really I think Gancer doesn't need

to be presented as an expert when they have Pond also noticed on the same issues who had far less factual involvement. I mean, the Sixth Circuit has warned that there are concerns about doing this, and there's this remedial approach that has passed muster, but just because it's, you know, convictions have been sustained doesn't mean it's the gold standard, and I think the gold standard here could be met by just not doing it.

THE COURT: Is there any dispute regarding either of those witnesses' qualifications to testify as experts on the subject matters outlined in the government's response?

MR. BLANCHARD: I think very clearly Pond is qualified. You know, we have had Gancer testify at a hearing that he's a drug investigator, but in terms of the reliability, he's been a drug investigator I think four years. He's never testified as an expert before. I question whether -- I'm always concerned anytime a drug investigator comes in and says, "The things I saw in the case, based on my training and experience, mean this thing." That always concerns me because there's I think a lot of temptation, or there can be, to vouch for your own case. And I don't know that Gancer has, I mean, it's obviously a call for the Court, but I don't know if Gancer has enough experience to meet that bar.

THE COURT: All right. Thank you, sir. Mr. Hakes,

go ahead, sir.

MR. HAKES: Your Honor, the question for the Court concerning this type of testimony isn't what's necessary or what's the gold standard, it's what's permissible. It's interesting, of course, that defense counsel thinks there's a different way for the government to meet its burden of proofs, but the defense counsel doesn't bear that burden, the government does, and it has selected a method of proof that the Sixth Circuit has repeatedly affirmed is both permissible and sufficient.

I do recognize the risk that defense counsel has identified, but as the Court has acknowledged, the government is not only willing but welcomes taking or implementing the mitigating steps that can make sure that the risks of stepping over an impermissible boundary here are mitigated.

We do plan to call Agent Pond as a drug trafficking expert who really will, I think, testify more in just the classic vain of, here's my experience as a drug trafficking expert, here's the type of things we see in drug trafficking investigations, here's how I would interpret this type of evidence that was collected here. We do intend to break even that testimony up so that it's clear for the jury when Agent Pond is testifying about his specific basis of knowledge concerning drug trafficking in general and when he's opining on evidence that was collected in this case.

Detective Gancer, I submit, is qualified for the same reasons that the Court -- that have been outlined in the government's briefs here, but the government doesn't intend to rely on Detective Gancer as its primary drug trafficking expert. We noticed him out of an abundance of caution, lest there should be some avenue of cross examination such that really Detective Gancer can effectively explain the steps that he took in this case with the meaning of particular evidence without relying upon his experience as a drug investigator. We didn't want in that situation to be stuck in a situation in which the defense is able to accuse us of not notifying a drug trafficking expert. But I do think Agent Pond is going to be the primary expert here, and to the extent that we need expert testimony on drug trafficking from Detective Gancer we'll take the steps proposed in the government's trial brief here.

THE COURT: Do I interpret your comments to mean that as far as 702 evidence is concerned as it relates to Officer Gancer your intention is to go that direction only in response to defense's cross examination or on the presentations during the course of the case?

MR. HAKES: The government's intent is to go into 702 evidence with respect to Detective Gancer as a last resort. That is not the government's plan with respect to Agent Pond. The government's plan is affirmatively to elicit 702 testimony. We don't -- you know, it's hard to predict

exactly how a trial is going to unfold. I don't want there to be a situation in which Detective Gancer has asked a question about a piece of evidence that he could fairly interpret but we're not able to get the answer to that question because he hasn't been noticed as a 702 witness. So the government's goal in this case is to use Agent Pond to provide the experience -- the expert testimony concerning drug trafficking. I do think Detective Gancer and other witnesses in the case, they will have to do some explaining as to why they took next steps in an investigation, but I don't really interpret that as 702 testimony even though they will have to explain, you know, in some instances why they thought, I don't know, a quarter baggie was indicative of drug trafficking. But that's more an explanation of why they took steps they did. The truly 702 testimony where you have a witness saying, "I'm here testifying based on my experience that this is my opinion as to what this evidence means," that will come from Agent Pond.

THE COURT: All right. Thank you. Mr. Blanchard, anything further on this issue, go ahead, sir.

MR. BLANCHARD: Just I guess even more so I think now we don't need Gancer testifying as an expert. I don't think the Court would hear my objection why did you do something -- to the question, why did you do something next when you found evidence as being an expert witness problem

anyway. I mean, he's -- that's not what I understood the notice to be. The notice was as a drug trafficking expert. It's the same notice that I got for Pond, and if they're not planning to put on that testimony, they just shouldn't put the testimony on.

THE COURT: Well, I think the government's response to your motion is, in essence, a narrowing of the potentiality of, at least this is the way I read it, and they can correct me if I'm wrong, a narrowing of what they intend to request of Officer Gancer as far as Rule 702 is concerned as it relates to some matter raised by the defense during the course of cross examination. That's the way I read it.

MR. BLANCHARD: I'm just really struggling to envision what that looks like, what question I ask that makes it -- him an expert on drug trafficking and relevant. I'm really struggling with that.

THE COURT: Well, and your point's well taken in that regard, and what I'm going to ask the government to do is if they're going to go down the road with Officer Gancer as it relates to 702 evidence, that before they do that, they give the Court notice and defense notice and give you the opportunity, to the extent that they're alleging that you opened the door in some way, I think you're entitled to respond before the 702 evidence comes in. So --

MR. BLANCHARD: That solves my problem.

THE COURT: Okay. Thank you. Well, Lopez-Medina deals with the issue of investigating officers testifying both as fact witnesses and opinion witnesses as it relates to drug trafficking. First, based on the -- based on this record, I think both Agent Pond and Officer Gancer are qualified to give opinions regarding drug trafficking evidence pursuant to 702. Officer Pond has testified before the Court before and has been qualified by this judge in previous cases. I don't know if Officer Gancer has testified as an expert before me. I think this is the first time the government has proffered that officer as an expert. But I think the appropriate precautionary measures can be taken pursuant to both witnesses if obviously calling the witnesses on two separate occasions.

As it relates to Officer Gancer, to the extent that the government wants to pursue 702 opinions of that particular officer, the Court would indicate to the government that I want a heads-up on that particular issue, give Mr. Blanchard the opportunity to weigh in on the proffered reason why Officer Gancer should be able to give 702 opinions, and then we'll move on from there.

So I believe that resolves the motion to exclude dual fact in experts. That leaves us with ECF 60, which is the defendant's motion in limine regarding 404(b). And I recognize that this one was filed on Friday. The government hasn't had the opportunity to weigh in specifically on this.

They filed a trial brief which outlined some of the -- some of the potential witnesses' testimony as it relates to 404(b). So what I'm going to do, I think, is proceed to hear from both of you on this particular subject. If the government believes trimming more trees and filing a response to the motion is appropriate I'll give you the opportunity, but I think some of this is -- can be resolved today. And I can give you some guidance on some of the potential testimony. So with that introduction, Mr. Blanchard, go ahead, sir.

MR. BLANCHARD: Do you want me to take these one at a time?

THE COURT: Oh, yes, one at a time is much better.

MR. BLANCHARD: I meant like trading off one at a time rather than me going through all of them. So the '98 marijuana conviction, right, so there's what they refer to as a drug trafficking conviction that I understand from the government is actually a marijuana, I guess, trafficking conviction out of Missouri. So it's 26 years old, and they offer that it's to prove his intent to distribute controlled substances, his knowledge of controlled substances and drug trafficking methods, and the absence of mistake in drug trafficking. I think for 404(b) to come in and not be propensity evidence, which would be, I think, largely unconstitutional and a violation of due process, there needs to be a permissible purpose and it needs to bear on something

that is in issue in the case. Mistake is not an issue -- will not be an issue with the case. And so then the question is does a 26-year-old marijuana trafficking conviction prove his intent to distribute controlled substances here, or his knowledge of controlled substances. And specifically the grand jury charged here cocaine and heroin. They didn't charge a broader controlled substance conspiracy. They didn't charge marijuana. They charged cocaine and heroin. And so I think it's, both because it's so temporally distant, you know, it's 26 years old, it's a different kind of drug that is alleged, it's a different set of facts. That was an actual trafficking conviction and not a conspiracy conviction. As I understand it, there's no allegation of conspiracy in that case. I don't know that it does a lot to enlighten whether Mr. Medrano conspired with unknown people in Michigan to distribute cocaine and heroin. And I think it really, and this really goes to each of the things, it raises the spector that they will convict him for something other than what the grand jury charged. And so for that reason, I don't think it's appropriate to introduce a 26-year-old conviction.

THE COURT: You have indicated that mistake will not be a part of your case. 404(b) comes in for certain items. Are any of those relevant to your presentation?

MR. BLANCHARD: Well, so I looked at the government's, you know, notice, and they're saying it's intent

to distribute controlled substances. I mean, I imagine the defense here is going to be that they can't prove that there was a conspiracy and agreement. I don't think the fact that somebody previously committed a crime does anything to enlighten whether there is presently an agreement between the parties, an intent. So, I mean, I guess I want to be candid, I suppose intent is in every trial. Certainly every conspiracy trial, right, they have to show the person intended to join the conspiracy knowingly and voluntarily. And so, I mean, I think intent is always an issue, but I don't see how a 26-year-old marijuana conviction does anything to show us the intent to join a conspiracy here. You know, it would be -- I could imagine a scenario where an old drug conviction could be enlightening on intent to join a conspiracy if the old conviction was perhaps a conspiracy conviction and the way that they reached their agreement was, you know, somewhat similar, you know, that might give you some evidence on the -- you know, the jury instruction about the agreement doesn't have to be express, or maybe it says written even, I don't recall.

THE COURT: Express or implied I think is the language.

MR. BLANCHARD: Perhaps. I mean, it could bear on that if it was a conspiracy conviction or something similar, but it's not similar here, other than it was a substance that

was prohibited, and that's really the only similarity that the government's made me aware of.

And then drug trafficking methods they say, I don't know that anything in this case is similar in any way to -- I don't have any investigative reports on the 26-year-old conviction, so I guess I don't really know, but from what I've been able to gather, I don't see any similarities there that would, you know, enlighten the jury on drug -- that he knows about certain drug trafficking methods employed in this -- alleged to have been employed in this case.

THE COURT: Thank you, sir. Mr. Hakes, Bill Clinton was president when this conviction occurred.

MR. HAKES: A fact I remember well, Your Honor. So it is older --

THE COURT: Were you out of law school at the time?

MR. HAKES: I have a right under the 5th Amendment of the Constitution, there are some questions I don't have to answer.

MR. BLANCHARD: I think high school would be the date period.

MR. HAKES: So I take the Court's point, this is old, and that weighs against the government. There's no --

THE COURT: And really I think that's dispositive. I think this conviction is way too old to have a probative -- probative value vis-a-vis the prejudice to the defendant.

That's my concern. So why don't you focus on that, because I really do think that 26 years ago has got a lot of whiskers on it, let's put it this way.

MR. HAKES: If this were a situation in which some witness is on the stand, question from the government is isn't it true that he was previously convicted of a crime, yes, he's a previously convicted marijuana dealer, I don't see that as being a permissible 404(b) purpose in the context of this trial. Here's how I think this could matter. And it brings me -- I know we wanted to go one at a time, but it's really related to the expected testimony of Mr. Glenn Fisher. So based on the interview that the government just had with Glenn Fisher, we expect Mr. Fisher to testify that he was previously engaged in marijuana trafficking with Mr. Medrano, that the two of them worked together to import and distribute marijuana in Michigan, and that after marijuana became legal here he and Mr. Medrano switched to trafficking cocaine because it was more profitable. Once there was a legal market for marijuana, there was less demand for the marijuana that Mr. Medrano had been able to supply into the district.

After that we expect, and, again, I don't know, this is just based on the pretrial interview, that Mr. Fisher is going to testify that he and Mr. Medrano worked together to distribute cocaine in the Western District of Michigan.

Now, I expect Mr. Blanchard will have some very tough

questions for Mr. Fisher, that he will be going very hard and attacking credibility of this witness, and to fairly assess Mr. Fisher's testimony, it is likely that the jury will need to know the basis of Mr. Fisher's knowledge, how is it that he knows the defendant this well, how long have they been in business with one another, and to that degree it's highly relevant that this is a years-long business partnership they have had to distribute controlled substances. If there is a challenge as to whether or not why would Mr. Medrano ever join such as agreement, then I do think it becomes very relevant that he's a previously convicted not only drug trafficker but marijuana trafficker. It indicates that Mr. Medrano has the knowledge base of the trafficking methods that Mr. Fisher himself will describe and that that informed the conspiracy that the two of them were apart of.

THE COURT: Well, is Fisher a part of the criminal activity which formed the basis for the '98 conviction?

MR. HAKES: He was not, Your Honor.

THE COURT: Fisher, from your perspective based on your information that you have to date, Fisher was involved in drug trafficking with the defendant in 1998?

MR. HAKES: No, I don't know whether it went as far back as 1998. That would surprise me, Your Honor, if it did. My understanding is Mr. Fisher began trafficking in marijuana with Mr. Medrano sometime circa 2010, maybe thereafter, and

sometime after that they transitioned their agreement on to one that had to do with the distribution of cocaine. So, no, I don't have any facts to indicate Mr. Fisher was involved when Bill Clinton was president, Your Honor.

THE COURT: All right. Thank you. I have not changed my mind. I think the '98 conviction is too old. I appreciate the potential testimony of Mr. Fisher, but if Mr. Fisher doesn't have any information regarding what was going on with the alleged -- what allegedly was going on with the defendant in terms of drug trafficking in 1998, whether it be marijuana or something else, again, if he hasn't got any information on that, I think the probative value of the '98 conviction is very low subject to significant prejudice to the defendant. So I'm going to exclude the '98 conviction.

MR. HAKES: Understood, Your Honor.

THE COURT: All right. Thank you. Mr. Blanchard, we'll move on to -- let's talk about the -- I think there's two issues involving Xanax, so why don't we discuss those both at the same time. Go ahead.

MR. BLANCHARD: So there's this Xanax. They have a witness who is going to say, I guess, that, and I'm not clear which one this is from the trial brief, but they have a witness who is expected to testify that Mr. Medrano provided him with what was alleged to be Xanax, and that in the witness's subjective opinion it was not Xanax and that it felt

like it might have been an opiate. And we don't have a time frame on that as best as I can tell.

I guess the way the government's trying to say this is relevant is because when they searched Mr. Palmer's house, in Mr. Palmer's house they found morphine pills. We don't know the source of those. We do know Mr. Palmer was on hospice at one point. But they found morphine pills in Mr. Palmer's house. Again, it's not charged by the grand jury. This is a cocaine and heroin conspiracy, and that -- in someone else's house. We don't even know if the grand jury thought Mr. Palmer was a conspirator. In his house they found morphine pills, and so then that somehow makes it relevant that someone says he got a Xanax pill from Mr. Medrano, and in his subjective experience he thought it felt more like an opiate than a Xanax. And I guess I lack the personal experience to know whether that's a call that one can make. But we're going to be way off in the weeds about all manner of things. It's not relevant whether he delivered personally a Xanax pill at some point to someone. That's not what he's accused of doing here. He's accused of conspiring to distribute cocaine and heroin. And we're going to be off in the weeds with some witness about whether he actually got the Xanax pill, whether it was actually Xanax, why the witness thinks it might have been an opiate, why any of that matters, when the question is whether he agreed with one or more

persons to distribute cocaine and heroin. So it seems prejudicial to me.

I also, you know, this is -- because I don't know the time frame it's a little bit confusing, but, you know, I've got a concern that this becomes a variance or a constructive amendment to the indictment when we start putting on proofs of delivery of drugs that weren't charged. The jury may convict Mr. Medrano not for what the grand jury indicted him for. And that's a real risk and, frankly, the 5th Amendment doesn't allow that, or shouldn't allow that. So I don't think there's any good reason to admit testimony that Mr. Medrano may have given a Xanax to somebody at some point. And I think the -- I'm sorry, the other Xanax issue I'm trying to recall --

THE COURT: Mr. Warden.

MR. BLANCHARD: Yes. That's the same kind of issue. It's a crime not charged by the grand jury. I think it presents the same unfair risk, you know, that they're going to convict him of something other than what's charged. And, again, it's that he may have given a Xanax to a person that's not part of the conspiracy or that we don't know is a conspirator. I don't think that's relevant to the question of whether he joined a conspiracy and whether they intended to distribute cocaine or heroin in this district.

THE COURT: Thank you, sir. Mr. Hakes, first help me with the time frame as it relates to Mr. Warden and the

other witness on the Xanax pills. What sort of time frame are we talking about?

MR. HAKES: Within the dates of the charged conspiracy, Your Honor.

THE COURT: All right. So it's between January of '22 and September of '23?

MR. HAKES: That's correct, Your Honor.

THE COURT: Okay.

MR. HAKES: So we noticed both the Xanax incident concerning the first witness, who is Jeffrey Palmer, who we expect based on pretrial interviews will testify that Mr. Medrano not only provided him with cocaine but also on at least one occasion provided him with some pills that did look like Xanax pills but the impact of them on his own body made him think they might have been something stronger, perhaps an opiate.

THE COURT: How is he going to offer that testimony?

MR. HAKES: So I don't intend to elicit the question how did it make you feel or what did you think that was in it. I just divulged to the defense what Mr. Palmer related in pretrial interview so that he had the opportunity to object to it here. I do think that this -- the fake Xanax bars are relevant for a reason that hasn't been talked about. So there was a search at the home of coconspirator, Susan Powers. In one bedroom of that home, there was a suitcase containing

$15,000, and also in that room were fake Xanax pills. So the Xanax evidence, insofar as these are fake Xanax pills, is a way of establishing circumstantial attribution of Mr. Medrano to that suitcase.

But truly, Your Honor, the government's position is this is not 404(b) evidence, this is res gestae evidence. The pills from that room were collected during the search of the home along with all the other evidence there. The dealings of Mr. Warden and Mr. Palmer with Mr. Medrano included, you know, these Xanax pills. That is not going to be the focus of the testimony elicited from any of the witnesses that I just mentioned here, but it is important for the jury to see that there's another clue pointing to the fact that Mr. Medrano is the supplier of the cocaine and heroin that is charged in this conspiracy, which is that he also has these same pills in the room where the $15,000 was found.

Again, this isn't going to be a key point of the testimony. I do not see the risk that Mr. Blanchard foresees the jury is going to hold Mr. Medrano -- find Mr. Medrano guilty because of any dealings with Xanax or marijuana or some other drug. The government certainly won't be asking the jury to reach a result for that reason. But for the purposes of allowing the witnesses, Mr. Palmer and Mr. Warden, to divulge the full spectrum of their dealings with Mr. Medrano during the course of this conspiracy, they need to be able to explain

the full course of their dealings. That did include, in at least the instances so far divulged, the distribution of these alleged Xanax pills. And I think it is an important clue showing, hey, it looks like this is Mr. Medrano's stuff in the bedroom that was searched.

THE COURT: The Xanax pills that you described as fake found in the luggage of the defendant with his ID in the bag; have I got that correct?

MR. HAKES: So, almost, Your Honor. So the bag that had the $15,000 in it had documents in Mr. Medrano's name. In the same room but not in the bag were these bar-shaped pills that looked like Xanax pills. So not in the same suitcase but in the same room.

THE COURT: And this is where Ms. Powers lived?

MR. HAKES: That's correct, Your Honor. She had a separate area, a separate bedroom in the house. This was all within one bedroom that the suitcase and these pills were located.

THE COURT: Have those Xanax pills been examined by the lab to determine exactly what they are?

MR. HAKES: So I believe those are the pills that were tested positive for morphine, Your Honor. I have to -- I actually don't know off the top of my head whether I'm confusing the pills from the bedroom or the pills from Mr. Palmer's house, and I don't want to mislead the Court, but

when I saw them I noticed, hey, these are very similar in appearance to the Xanax pills that people have been talking about and the ones that Mr. Palmer described, so we wanted to notice that to defense out of an abundance of caution here.

THE COURT: So if I understand Mr. Palmer's proposed testimony first is it he's going to testify that he bought cocaine from the defendant?

MR. HAKES: He's going to testify that Mr. Medrano sold him cocaine. We expect him to testify that Mr. Medrano would use Mr. Palmer's house as a location to store cocaine for others who would come and pick it up, that he also allowed Mr. Medrano to use Mr. Palmer's house as a collection point from drug proceeds from other people, and that at Mr. Palmer's house, Susan Powers would come and sometimes collect payment from Mr. Palmer or from other people who had left payment with Mr. Palmer. Now, in addition to that, Mr. Palmer, we expect him to also testify that on at least one occasion Mr. Medrano provided him with some, what he purported were Xanax pills, to help alleviate Mr. Palmer's pain. Mr. Palmer has some chronic pain issues. They were the subject to a previous motion. So the bulk of Mr. Palmer's testimony is not going to be about these terrible Xanax pills that were introduced.

THE COURT: What about Mr. Warden as relates to Xanax?

MR. HAKES: Mr. Warden, as it relates to Xanax, we

expect his testimony to be that he paid off a debt that another person, Mr. Fisher, incurred in relation to some Xanax pills. That the same runner, Susan Powers, came and collected the payment for those pills. So Ms. Powers is the same person whose home was searched and where these other pills were and who was seen on surveillance making trips on Mr. Medrano's behalf and whose phone also indicates she was involved in drug trafficking with Mr. Medrano.

THE COURT: All right. Thank you. Mr. Blanchard, go ahead, sir.

MR. BLANCHARD: It might be an interesting fact if he was charged with trafficking in Xanax, but he's not. He's accused of conspiring to traffic in cocaine and heroin. What I noticed was for Palmer in particular, that the allegation that he gave him Xanax was not to further drug trafficking, it was to help with pain. And that's awfully confusing and surely would be a crime. I don't think getting involved in, you know, only a physician can dispense medication, but it's not the crime that's charged here and it's not the kind of crime charged here, conspiracy to distribute, further distribute in the community. It's -- they're talking about a buyer-seller type thing. I think it's confusing. I think it raises the spector that, you know, we're going to have a variance from the indictment and he'll be convicted of something other than what's charged.

THE COURT: If I understood Mr. Hakes correctly, Mr. Palmer is going to testify regarding his relationship with the defendant as it relates to cocaine, which is clearly within the four squares of the indictment. The timing doesn't appear to be a problem, at least from my perspective. Come back at me if you think otherwise. It's within the time frame alleged in the indictment. And there's this allegation regarding -- setting aside the notion, well, it must have been opiates that were in there, the trafficking in Xanax at the same time that he's trafficking with the defendant allegedly involving cocaine, why isn't that a sufficient evidentiary link to allow as to Mr. Palmer the fact that he bought fake or altered Xanax pills? It's a separate issue as to whether he's qualified to say that it was opiates, but why don't we go from there?

MR. BLANCHARD: So I don't think -- I guess two things. One, I think calling that trafficking, I think the Court's right, it probably is technically trafficking to deliver fake Xanax pills. It's not in the thrust of what's charged in the indictment. Setting that piece aside, the logical link to make these, what they say are fake Xanax pills, and I sure thought the morphine pills were found at Palmer's house and not at this Sue Powers' house, but setting that aside, these allegedly fake Xanax pills that are found at Sue Powers' house, there's nothing to tie it up that whatever

Palmer says Medrano gave him was, in fact, fake. Like this link works if it's the same drug. They can say, see, we have some evidence that the kind of drug that Jeff Palmer says he got was found kind of near Mr. Medrano's suitcase in someone else's house, and so just trust us that he probably delivered it? I don't know. It seems like we're going to get off in the weeds, and my concern it's not what's charged, right? If this was a conspiracy to deliver Xanax, it would make a lot of sense here. It would be relevant that, you know, they found the Xanax in close, you know, relation to it, but it's not. It's propensity evidence.

THE COURT: To the extent that that might be an issue, I hear you on it, why doesn't an instruction take care of that?

MR. BLANCHARD: You know, I think my favorite saying on that is you can't throw a skunk in the jury box and tell the jury not to smell it. I mean, like if it's not probative, we shouldn't risk it. It's a question of harm. And somebody may say, well, if he's handing out Xanax to his friends or his associates or whatever, he probably did the other things. The question here is about cocaine and heroin. And I think there's just a lot of risk of prejudice that we don't need to chance.

THE COURT: Okay. Thank you. Mr. Hakes, anything else on this?

MR. HAKES: Perhaps if we had charged a conspiracy to distribute Xanax and we were talking about other cocaine or heroin dealings that were uncharged there might be something to this prejudice argument, but I don't think the jury is going to say, hey, the government is asking us to consider whether he is guilty of conspiring to distribute these two more serious drugs, but we're going to infer that because he was distributing a drug that all of us have heard of before that he's guilty and therefore hold him accountable on that. I think the Court's right that an instruction can easily mitigate the risk of that prejudice. That's the only additional point I wanted to make.

THE COURT: All right. As far as Mr. Warden is concerned as it relates to Xanax, it seems to me that this is a, to use the pool analogy, a three-cushion shot, that something having to do with Fisher going this way. I mean, it seems to me that as far as Mr. Warden is concerned as it relates to the Xanax, it just seems to me that that's quite attenuated even if it's within -- even if it's within the time frame of the conspiracy.

MR. HAKES: So the reason the government submits it's not attenuated is that it's the same person, Susan Powers, who comes and collects that payment from Mr. Warden's home, and so it's evident that she is, in fact, working with Mr. Medrano to distribute controlled substances. Now,

Mr. Warden also has additional stuff to say regarding cocaine and Mr. Medrano --

THE COURT: Well, that's involving the car, right?

MR. HAKES: That's correct.

THE COURT: That's a separate issue. All right. Thank you. I heard the argument on this, and first I think it's important that the allegations as it relates to the potential testimony of Mr. Palmer related to the Xanax is within the time frame of the alleged conspiracy in the indictment, Number 1. Number 2, Mr. Palmer is going to testify regarding cocaine transactions with the defendant. As to Mr. Palmer and Xanax pills from the defendant, allegedly, I'm going to allow that, but I'm not convinced that Mr. Palmer is in a position to say that the other substance that was in the Xanax pills was opiates. And, Mr. Hakes, if you want to pursue that, you're going to have to give me something to justify allowing Mr. Palmer to testify that, well, it wasn't Xanax, or if it was Xanax, it had to be opiates, too. I'm not going to allow you to go there if that's what you're proposing.

MR. HAKES: No, and just to make a record, I'm sitting here nodding my head agreeing with the Court that that's not a door we plan to open.

THE COURT: Okay. As to Mr. Warden, I do think that's real attenuated, so I'm not going to allow Mr. Warden

to testify about receiving Xanax pills from the defendant. I just think the testimony there is too attenuated and its probative value is not sufficient to allow it to come in. I recognize the res gestae argument, but I just think that's just too attenuated.

As it relates to the alleged car-cocaine transaction, or attempted transaction, let's deal with that one. Mr. Blanchard, go ahead.

MR. BLANCHARD: I don't know that -- so the allegation is that Mr. Warden will say that Migo wanted to trade a half kilo of cocaine for a Camaro. That's what I understand they're saying happened in July of '23. The -- I just don't know if what's charged here is just a conspiracy with other people to distribute, out doing street-level deals, and we've got a deal that never even went through that's not supported by anything. I mean, it's -- I can appreciate why they think it's maybe part of the res gestae maybe, but we're going to be way off in the weeds fighting about a lot of credibility issues, just for one other thing. One thing that I think is distracting and not -- when really they need to prove my client agreed with someone, and they're clearly not saying he agreed with Mr. Warden to distribute cocaine. So I don't know -- I don't know that an attempted buyer-seller deal does anything to enlighten whether he agreed with these unknown people to distribute in the district.

THE COURT: Thank you. I think that this one is clearly admissible. It's got to do with cocaine. It's within the time frame of the alleged conspiracy in the indictment. So I think that testimony is admissible.

I skipped over Mr. Fisher. If I appreciated Mr. Fishers' testimony involves marijuana trafficking alone, am I right about that?

MR. HAKES: No, Your Honor. So Mr. Fisher will testify concerning cocaine dealings with Mr. Medrano and heroin dealing with Mr. Medrano.

THE COURT: But you want to get in marijuana, too?

MR. HAKES: Well, he was the person that I talked with the Court about when I first got up saying that initially he got into business with Mr. Medrano to distribute marijuana, then when that didn't -- no longer was profitable, they switched to a cocaine enterprise. And then at one moment during their cocaine conspiracy they also experimented with whether or not Mr. Fisher would be distributing heroin that Mr. Medrano supplied to him.

THE COURT: All right. Thank you. Go ahead, Mr. Blanchard.

MR. BLANCHARD: I mean, I think the cocaine and heroin, the question is time frame. We don't know that, right? We know that this goes back to 2010. And if this is dealing back in 2010 or 2011, I don't think it's relevant to

whether there is a conspiracy with some people in 2022 and 2023. I mean, if they're saying that he was doing this dealing during the time period of the conspiracy, I mean, I'd like you to keep it out, but if it -- it's probably like the Camaro. If it's happening during the time frame of the conspiracy, then the notice doesn't say what the time frame for this is.

THE COURT: What's the time frame here, Mr. Hakes?

MR. HAKES: During the charged conspiracy, Your Honor, so within the 2022-2023 charged period is the time frame in which Mr. Fisher will testify that he was engaged in cocaine and heroin dealings with Mr. Medrano. The marijuana dealings predate that. That was the beginning of their relationship. That marijuana dealing began circa 2010. And sometime thereafter they transitioned to dealing in cocaine.

THE COURT: Okay. 2010 being about 12 years before the alleged time frame in the indictment?

MR. BLANCHARD: Yeah.

MR. HAKES: Yes, Your Honor, but it became relevant as a motive between these two parties during their cocaine enterprise. So Mr. Fisher explains to investigators that he actually was stopped transporting approximately 46 pounds of marijuana on behalf of Mr. Medrano. Mr. Fisher then was incarcerated as a result of that and incurred a drug trafficking conviction himself. We expect that he would

explain that either during or shortly after his incarceration, Mr. Medrano then demanded payment from Mr. Fisher for the seized marijuana even though Mr. Medrano was aware that Mr. Fisher had only lost the marijuana because of a police seizure of that substance. Mr. Fisher, we then expect will testify, that part of the reason he ran an outstanding cocaine tab in his relationship with Mr. Medrano was because he still had some bitterness towards Mr. Medrano for not being, as what he perceived, fair to him in the dealings of his arrest concerning that 46 pounds of marijuana that were seized. So it -- he reflected -- related to us that his marijuana relationship with Mr. Medrano, which soured, actually colored the way that he did business with Mr. Medrano once they transitioned to cocaine dealings together.

THE COURT: All right. Thank you. Go ahead, Mr. Blanchard.

MR. BLANCHARD: I don't see how marijuana during the Obama administration is relevant here. I just don't see it. I mean, if they have evidence that he was trafficking during the charged period of the conspiracy, I think that's probably relevant, I guess, if it's believed. But I don't know how marijuana back in 2010 is -- we're going to be off in the weeds about relationships and apparently anger over drug debt, so they keep doing business but don't pay in full I guess is the argument. I mean, we're going to be having a trial about

some 2010, I guess, marijuana if that's what we're doing. I'm just not sure it helps the jury figure out whether Mr. Medrano agreed with anyone in 2022 to distribute cocaine or heroin.

THE COURT: All right. Thank you. I think the prior relationship as it relates to the marijuana, that door can be opened if there is an attack regarding the relationship between Mr. Medrano and Mr. Fisher as it relates to the cocaine and the heroin, but as an initial matter, I'm not going to allow it. But cross examination may open the door, and the government may, under certain circumstances, have the opportunity to relate back to the marijuana time frame, if you will, in relationship to Mr. Medrano. But based on this record, I'm not going to allow it.

MR. HAKES: Understood, Your Honor. We were just discussing, if we feel the door's been opened we'll give the Court some advance notice that we intend to open --

THE COURT: Terrific. That's great.

MR. HAKES: Your Honor, on the Xanax question, I didn't hear the Court address, what about the pills in the room with the suitcase? Has the Court ruled that the government may not mention those pills that were also recovered?

THE COURT: I don't think that's within the four squares of the motion.

MR. HAKES: Very well, Your Honor.

THE COURT: Because the pills, I assume, the government's going to offer it to tie to Mr. Medrano and not anybody else?

MR. HAKES: That's correct, Your Honor.

THE COURT: Right. So I don't think that was within the four squares of the motion that was filed. I could be wrong. Go ahead, Mr. Blanchard.

MR. BLANCHARD: It wasn't because I didn't receive a notice that they wanted to introduce evidence that he possessed the drug other than charged in the indictment. I think it would be a -- I think it would be 404(b) to say, well, we also caught him in possession of something that's uncharged. And I didn't get notice on that so I didn't address it. But to the extent that they want to introduce the pills that were found in there I think it would be another -- it would be a prior bad act that he possessed a drug other than charged in the indictment. So I would object to it on that basis. Sorry I didn't frame that.

THE COURT: No, that's okay. That's okay. I still think it's admissible because it's part of the treasure trove, if you will, of what was found.

MR. BLANCHARD: Very small treasure trove.

THE COURT: In Ms. Powers' place. And the relationship between the defendant and Ms. Powers will apparently be established by other evidence.

Anything else on your motions, Mr. Blanchard?

MR. BLANCHARD: One moment. I think we've touched on everything. I just want to make sure that I didn't miss something.

I don't think I have anything else on the motions. I did flag the Enright issue in my brief. The government did as well. I would appreciate some direction on that, how the Court wants to --

THE COURT: I'm sorry, I didn't hear you.

MR. BLANCHARD: Sorry.

THE COURT: That's okay.

MR. BLANCHARD: I just said that I don't have anything else on the motions in limine. I did put in my brief, and I think the government did as well, the Enright coconspirator statement issue and how -- I'm curious how the Court wants to address that. That was on my list today.

THE COURT: Okay.

MR. BLANCHARD: But it's not -- I don't have a motion on that. I'm just requesting some guidance on how the Court wants to address that.

THE COURT: Thank you. Mr. Hakes, do you want to address that?

MR. HAKES: Your Honor, we're talking about text messages that were intercepted pursuant to multiple search warrants. I have never done a drug trafficking trial in which

this Court or any of your colleagues in the Western District employed the method whereby we have a mini trial on whether these were statements of coconspirators beforehand. That would absorb a significant amount of unnecessary time here.

THE COURT: You want me to adopt option 3, right?

MR. HAKES: I do, Your Honor.

THE COURT: Okay.

MR. HAKES: I think it's consistent with this Court's practice in other cases. The alleged coconspirator statements have been provided to defense counsel previously in discovery and even just today in the form of proposed government's exhibits, so if there is a specific one that they think really are not going to qualify we can entertain that, but I think just a general objection to let's have a mini trial on whether these are coconspirator statements is unnecessary and option 3 is the way that we should go.

THE COURT: Okay. Go ahead, Mr. Blanchard.

MR. BLANCHARD: I would say I also never had a trial in this district or anywhere where there was a single person charged in a conspiracy, and so for that reason I think it's a little bit interesting that we have -- the grand jury didn't charge, you know, that these people who they say are coconspirators were coconspirators. And that's why I think this is unique and option 3 isn't the way to go. Because what if we get to the end and the Court's like, well, I'm not

actually sure he conspired with these people, we're going to scrap it and do it again? That's my concern. Normally I think it's, you know, the grand jury made a probable cause finding that people are conspirators. I think option 3 makes a lot of sense in most cases. Here I don't think it does.

THE COURT: Well, I'm going to go with option 3, and we'll take it -- we'll address it in that fashion. And if there's a problem, obviously there's potential remedies for it if there is an ultimate problem.

All right. Mr. Blanchard, anything else from the defense perspective that we need to talk about other than length of trial, which we'll get to momentarily?

MR. BLANCHARD: Just procedurally I also flagged, I understand maybe there's going to be some witnesses that need counsel from the government's side. I'm just thinking we should be thinking about that so that we -- I've had some reason to believe the Court would like us to keep this on track to get done next week and so --

THE COURT: That would be accurate.

MR. BLANCHARD: Yes. I'm also interested in being done before the holiday. I just wanted to flag for the Court we need to be thinking about that.

THE COURT: Thank you. Mr. Hakes.

MR. HAKES: The government was already aware of this issue and has already put the Federal Public Defender's Office

on standby to have counsel available this week should any of the civilian witnesses request that. The majority of the civilian witnesses identified in the government's trial brief are already represented by counsel. We provided a financial affidavit today to another witness who represented to us that he thought his income was too high in order to qualify for court-appointed counsel. We nevertheless provided him with a form and indicated that if he wished to retain counsel before testifying next week, he'd certainly be free to do so. That leaves one outstanding witness that we do expect to receive a financial affidavit from. But as I said, the government's already taken steps to ensure that that person has court-appointed counsel such that they can confer with that person before.

THE COURT: All right. Well, let's try to expeditiously deal with the obvious planning availability of lawyers if the witnesses are requesting counsel and they want counsel here, et cetera, so let's do our best to, and I'm sure your witness unit will take care of that, but -- or your -- you guys will take care of it.

MR. HAKES: Very well.

THE COURT: Let's try to be efficient as to time. I suggested in an email, I asked Ms. Redmond to send you an email regarding jury pick and opening statement on Monday as opposed to starting the trial on Tuesday. There was some

indication that there was going to be an exchange of exhibits for purposes of defining stipulations which might have taken care of some witness time. I don't know if that's happened. But what's -- I'd appreciate hearing from both counsel as to what their best estimates are in terms of trial length.

MR. HAKES: I think we should go with the Monday start. The government's adapted to that and is planning with the jury selection and opening statements only to occur that day. That will allow us to start right with witnesses first thing on Tuesday morning. I would be surprised if the government's proofs took us all the way through the end of the day on Friday. I've asked -- I projected three to four days because I'd much rather give time back to the Court than take it from the Court, but I think this is a two- or three-day trial. The government does have at this point I think 22 witnesses on its list, but many of those are very short foundational witnesses that I expect five minutes of direct testimony on. And, you know, for that reason I don't think it will an especially robust cross. Some of the witnesses will be more lengthy, but, again, I think we're within the time frame of giving the jury the case sometime on Thursday so that deliberations are complete by Friday.

THE COURT: All right. The purpose of my communication was the scheduled anniversary program for the Criminal Justice Act, which is being fostered by the

defender's office on Thursday at 3 o'clock. I would like to go to that, which would mean that we'd break for the day at 2 or so, maybe not even do the lunch hour on that day, so I'd ask you to keep me advised as to what your best estimate is as to whether we're on track or behind or ahead. If necessary I won't go, because this case takes priority over that event, as important as it is obviously to the district and presence of the Article 3s is important, but if necessary I won't go.

MR. HAKES: Understood.

THE COURT: But that was the purpose of my inquiry.

MR. HAKES: We'll do what we can to keep us moving expeditiously through trial.

THE COURT: Mr. Blanchard, do you have any reaction to what Mr. Hakes said regarding trial length?

MR. BLANCHARD: I think a two- to three-day trial makes sense on these facts. So I think what would be helpful, I got the exhibits today, I'd like to see what we can streamline in terms of unnecessary witnesses. I don't know if I have all the material yet. I may well have it. They provided me a lot of stuff. But that's going to drive probably whether we can -- what we can agree to in terms of stipulations or foundational witnesses. I imagine for me I'll need a half a day.

THE COURT: Okay. Well, this is a situation where it's going to be dependent on how we're moving along, and like

I said, if it looks like we're behind, I won't go. But let's start on Monday morning, and we'll do jury pick and opening statement, if there is enough time to conclude opening statements by the noon hour or shortly thereafter, so the government should be prepared to make their opening.
Mr. Blanchard, I don't know, you probably haven't even made a decision yet regarding whether you want to reserve or not.

MR. BLANCHARD: I have never reserved. I'm not going to start this time.

THE COURT: Okay. That makes it pretty clear. We will -- so plan on opening statements, unless voir dire takes an extraordinary amount of time and we're towards the noon hour, because I have commitments in the afternoon unrelated to this case. So we'll count on opening statements unless voir dire takes longer than anticipated. My last experience was --

MR. BLANCHARD: I'm much quicker than Mr. Gibbons.

THE COURT: Actually Mr. Gibbons, in fairness, was not the only offender. Okay. Fair enough. Mr. Blanchard, I did not give you the opportunity to introduce your colleague.

MR. BLANCHARD: I'm sorry.

THE COURT: No, I apologize.

MR. BLANCHARD: Sundus Jaber. She's a newer attorney from Detroit, or Metro Detroit. Everything east of Lansing to me is Detroit, and Detroit people get upset when I say that. But she does criminal defense work over there, and

she's recently admitted.

THE COURT: Counsel, welcome.

MS. JABER: Thank you.

THE COURT: I look forward to working with you.

MS. JABER: Thank you, Judge.

THE COURT: Anything else for today from the government's perspective?

MR. HAKES: One other thing I wanted to address with the Court is accommodations for Mr. Palmer. He's the witness that had the serious health issues that were the subject of the prior motion. Speaking with his lawyer, it's not clear to me whether or not he can take the witness stand or will need to testify from a wheelchair. I do think he will be able to, but I wasn't able to get assurances that he has enough mobility to get up out of his chair and do the couple of steps.

THE COURT: Oh. We'll put the chair in front of the witness stand.

MR. HAKES: So I just wanted to flag the Court we may need that accommodation.

THE COURT: We need to accommodate that. If he can't actually get into the witness stand chair, we'll allow him to place the wheelchair right in front of the witness stand.

MR. HAKES: Thank you, Your Honor. Based on my last

conversation with Mr. Palmer, he does have some chronic pain issues that require him to adjust his posture a lot during the conversation we had, and I don't know if he will need a break during testimony depending on the condition of his heart and everything else that he has going on.

THE COURT: Just alert the witness that if he needs a break, he should say so.

MR. HAKES: Very well. That is the only other housekeeping matter I have for the day, Your Honor.

THE COURT: Thank you. Mr. Blanchard.

MR. BLANCHARD: I had one. We filed some, or the government filed some joint jury instructions on Friday. There was really I think one issue that's outstanding that needs the Court's resolution, and I'm not sure that's super obvious in the way we filed it.

THE COURT: I haven't had a chance to look at the filing.

MR. BLANCHARD: I don't know that it's got to be resolved today even. I just wanted to flag for the Court. It's in 14.05, and it's the subparagraph I think number (4), (A)(4). We have a dispute about whether that applies.

THE COURT: Okay. I'll take a look at it.

MR. BLANCHARD: That's all I have.

THE COURT: All right. Thank you. That's all for today.

MR. BLANCHARD: Thank you.

THE COURT: See you Monday.

THE CLERK: All rise, please. Court is adjourned.

(Proceedings concluded at 3:40 p.m.)

REPORTER'S CERTIFICATE

I, Lauret J. Henry, Official Court Reporter for the United States District Court for the Western District of Michigan, appointed pursuant to the provisions of Title 28, United States Code, Section 753, do hereby certify that the foregoing is a full, true and correct transcript of the proceedings had in the within entitled and numbered cause on the date hereinbefore set forth; and I do further certify that the foregoing transcript has been prepared by me or under my direction.

/s/ Lauret J. Henry
Lauret J. Henry, CSR, RPR
U.S. District Court Reporter
410 West Michigan Avenue
Suite 137
Kalamazoo, MI 49007
(269) 720-9529